# EXHIBIT A



ATTORNEYS AT LAW

222 N. LaSalle, Suite 300
Chicago, IL 60601

T 312-704-3000
F 312-704-3001
www.hinshawlaw.com

October 5, 2011

**VIA EMAIL**



Curtis Warner
Warner Law Firm, LLC
Millennium Park Plaza
155 N. Michigan Ave. Ste. 560
Chicago, Illinois 60601

*Re: Tang v. Siegel*

Dear Counsel:

This letter is a confidential communication to you and is otherwise protected by FRE 408. In particular, the parties have agreed to keep all settlement communications highly confidential.



1.

2. The immediate dismissal without prejudice of Plaintiff's: (a) individual and class based TCPA claim and (b) individual FDCPA c            state

3.

4.



October 5, 2011
Page 2

5. 

Sincerely,

HINSHAW & CULBERTSON LLP

*James C. Vlahakis (Electronic Signature)*

James C. Vlahakis
jvlahakis@hinshawlaw.com

JCV:rn

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


| | |
|---|---|
| LOIDY TANG, individually | ) |
| and on behalf of a | ) |
| class, | ) |
|      Plaintiff, | ) |
|   vs. | ) Case No. 11 C 2109 |
| MEDICAL RECOVERY | ) |
| SPECIALISTS, L.L.C., | ) |
| d/b/a MRS, d/b/a MRSI | ) |
| and d/b/a MEDICAL | ) |
| RECOVERY SPECIALISTS, | ) |
| INC., | ) |
|      Defendants. | ) |


The deposition of LOIDY TANG, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before CHRISTINE M. PINA, a notary public within and for the County of Will and State of Illinois, at 222 North LaSalle Street, Suite 300, Chicago, Illinois, on October 20, 2011 at the hour of 11:17 o'clock a.m.


Reported by:  CHRISTINE M. PINA, CSR, RPR
License No.:  084-003785

1

1     APPEARANCES:

2          WARNER LAW FIRM

3          BY:  MR. CURTIS WARNER

4          155 North Michigan Avenue, Suite 560

5          Chicago, Illinois  60601

6          (312) 238-9820

7          cwarner@warnerlawllc.com

8               on behalf of the Plaintiff;

9

10         HINSHAW & CULBERTSON

11         BY:  MR. JAMES C. VLAHAKIS

12         222 North LaSalle Street, Suite 300

13         Chicago, Illinois 60601

14         (312) 704-3000

15         jvlahakis@hinshawlaw.com

16              on behalf of the Defendant.

17

18

19

20

21

22

23

24

2

1    them you've got the wrong number?

2        A.   I believe that might have happened with a

3    live person misdialing my number; they acknowledged

4    they misdialed my number.

5        Q.   So, the live person speaking to you.  You

6    don't recall somebody dialing your number and

7    saying is Kimberly there?

8        A.   No, I don't recall that.

9        Q.   With regard to DG's phone, are you aware

10   of whether anybody has attempted or a live person

11   has ever spoken to DG asking to speak with a

12   Kimberly or a Chivette Nelson?

13       A.   I'm not aware of that.

14       Q.   Have either your daughter or your husband

15   been the recipients of automated phone messages for

16   other persons that the message was trying to reach?

17       A.   My daughter has not mentioned that, and my

18   husband has not mentioned that either.

19       Q.   Have you ever asked them if they received

20   those types of calls?

21       A.   I have, but their answer was I don't know.

22       Q.   Are you aware of whether or not your

23   lawsuit on behalf of DG against William Siegel &

24   Associates has resulted in a settlement?

                                                    19

1      MR. WARNER:  I'm just going to object.

2      MR. VLAHAKIS:  I'm not going to go into

3   specifics, Curtis.

4      MR. WARNER:  Well, I'm still just going to

5   object.  The court record states what the court

6   record states.

7      THE WITNESS:  Well, I don't know why you're

8   asking me about that matter if we're talking about

9   this matter here today.  I just don't understand.

10     MR. VLAHAKIS:  I'll explain it to you.  I don't

11  want you to go into whether there's -- you know,

12  what the terms are necessarily or identify the

13  amount of any settlement or anything like that.

14  But I'd like to know if you know today whether or

15  not you've reached a settlement in the Siegel case.

16     MR. WARNER:  Again, I'm going to object and

17  tell you not to answer that.

18  BY MR. VLAHAKIS:

19     Q.   Are you aware of whether you've reached a

20  confidential settlement in that case?

21     MR. WARNER:  Again, I'm going to object and

22  tell you not to answer that.

23     MR. VLAHAKIS:  Do you want to talk outside real

24  quick?  I'm trying to avoid having to call the

                                                    20

1    judge on it.

2        MR. WARNER:  Sure.

3                        (Whereupon, a short break was

4                        taken.)

5    BY MR. VLAHAKIS:

6        Q.    Miss Tang, do you have an awareness as to

7    whether the Siegel case has been dismissed?

8        THE WITNESS:  Can I ask you a question?

9        MR. VLAHAKIS:  Sure.

10       THE WITNESS:  Do I have the right to talk to my

11   attorney right now?

12       MR. VLAHAKIS:  If you would like to, sure.

13   I'll leave the room or you can go outside; it's up

14   to you.

15       MR. WARNER:  Well --

16       MR. VLAHAKIS:  She wants to.  We don't have to.

17       MR. WARNER:  Sure.  We can stop right here

18   for -- I'll listen to what her question is off the

19   record, and then --

20       MR. VLAHAKIS:  Okay.

21                        (Whereupon, a discussion was

22                        had off the record.)

23       MR. VLAHAKIS:  Could you read my question back,

24   please?

21

1                        (Whereupon, the record was

2                        read as requested.)

3      MR. VLAHAKIS:  Are you prepared to answer that

4  question?

5      THE WITNESS:  I'm prepared to answer that

6  question with -- I'm going to --

7      MR. WARNER:  I haven't objected to that

8  question.

9      MR. VLAHAKIS:  Please do, Curtis, if you want

10  to.  Are you objecting to that question?

11      MR. WARNER:  No, I'm not, not as stated.

12      MR. VLAHAKIS:  Can you read that back?

13                   (Whereupon, the record was

14                   read as requested.)

15      MR. WARNER:  You can answer that.

16      THE WITNESS:  Okay, but it's my understanding

17  that I cannot answer.

18      MR. WARNER:  Well, no, no.  I'm not objecting

19  to that one.

20      THE WITNESS:  Oh, you're not.  Sorry.

21      MR. VLAHAKIS:  He may object to any follow-ups,

22  but let's -- if you're prepared to answer that one,

23  then let's hear what the next question is.

24      THE WITNESS:  Can you rephrase your question?

22

1    BY MR. VLAHAKIS:

2        Q.    Sure.  Do you have an understanding of the

3    current status of the Siegel case?

4        A.    Whatever I speak with my lawyer, it's

5    privileged and confidential in regards to other

6    matters that are not this one.

7        Q.    If I am going to be asking any questions

8    about the Siegel case and the status of it and

9    whether any settlement has been reached, are you

10   going to be refusing to answer those questions

11   based on something your attorney may have told you?

12       A.    No.

13   MR. WARNER:  I'll object only to the point of

14   whether a settlement has been reached; I'm

15   objecting to that.  The line of questioning that

16   you've asked is the status of the case, and perhaps

17   maybe status might be a term that might not -- it

18   can be worded differently to maybe elicit the

19   answer you want.  I know I will ask a different

20   word in follow-up if we don't have the answers

21   here.

22   MR. VLAHAKIS:  Sure.  But for the record to

23   maybe avoid a lot of questions on this, are you

24   stating that if I ask her any questions as to her

23

1    awareness of a settlement in the Siegel case, you

2    would instruct her not to answer?

3        MR. WARNER:  That is correct.

4    BY MR. VLAHAKIS:

5        Q.   Then I'll rephrase the question and ask

6    you do you know if the Siegel case has been

7    dismissed?

8        A.   Yes.

9        Q.   Do you know why the Siegel case was

10   dismissed?

11       MR. WARNER:  That I'm going to object to.  You

12   don't have to answer that.  And, also, it calls for

13   attorney-client privilege, too, beyond just the

14   general objection.

15   BY MR. VLAHAKIS:

16       Q.   I'm not asking for any answer that may

17   elicit something your attorney has told you, but do

18   you have any independent knowledge as to why the

19   Siegel case was dismissed?  If your attorney wants

20   to object, give him a second to do so.

21       MR. WARNER:  Not if the answer is a yes or no

22   question.  I mean it was phrased as a yes or no

23   question.

24       THE WITNESS:  Can you repeat the question?

                                                      24

1                    (Whereupon, the record was

2                    read as requested.)

3      THE WITNESS:  Yes.

4  BY MR. VLAHAKIS:

5      Q.   What is that knowledge?

6      MR. WARNER:  That I'm going to object to.

7  Don't answer it.

8      MR. VLAHAKIS:  What's the basis for your

9  objection?

10     MR. WARNER:  Attorney-client privilege.

11 BY MR. VLAHAKIS:

12     Q.   Do you have any understanding why the

13 Siegel case was dismissed other than what your

14 attorney may have told you?

15     A.   Not other than what my attorney has told

16 me.

17     Q.   Did you sign any document that led to the

18 dismissal of the case?

19     MR. WARNER:  I'm going to object to that.  You

20 don't have to answer.

21     MR. VLAHAKIS:  What basis?

22     MR. WARNER:  Counsel, we had this discussion

23 off the record of why -- and I said you are more

24 than free to take it up with Judge Holderman in

                                                    25

1    this case, and I don't have any problem with that.

2    I don't have any problem with an in-camera review

3    over the issue of the line of questions of where

4    you are going with these, I don't.

5         MR. VLAHAKIS:  I want to make sure I have the

6    foundation to demonstrate to Judge Holderman we've

7    asked the questions, what the nature of the

8    questions are very specifically, and what the

9    objections were and what may have not been answered

10   and what we're kind of shelving for a later date.

11   I have no problem with bringing it up later, but I

12   want to be able to say I've asked these questions

13   and received these answers and no answers to

14   certain questions.

15        MR. WARNER:  Well, counsel, you're also the

16   counsel in the Siegel matter, too.  And you know

17   where I draw the line of where you're trying to

18   tread, and that is the reason for the objections.

19   I can take it up in-camera with the judge, I don't

20   have a problem with it, but we're not going to make

21   a record here unless so ordered by the court to

22   move forward and to disclose the answers to the

23   questions you are asking the client.

24        MR. VLAHAKIS:  The fact that I'm Attorney of

                                                    26

1    Record in Siegel is somewhat immaterial.  I'm

2    asking these questions as a lawyer going in blind,

3    I might ask the questions not knowing what the

4    disposition of the Siegel case is.  And I'm trying

5    to respect what we have discussed leading up to

6    that termination of that case, but I want to be

7    able to ask what she may know in order to make a

8    record like any other attorney would be able to

9    make.

10       MR. WARNER:  She's answered.  She says she has

11   an independent recollection of why it was there.

12   The basis of it is there is a communication with

13   her attorney.  She's saying that she's had

14   discussions with her attorney that led up to it.

15   There has been communications between client.  If

16   you're asking about adequacy issues, which is where

17   I think you're going with it, yes, ask her has

18   there been communications with your client.  In

19   this case, was there communications with your

20   client in the DG versus Siegel case, you can ask

21   her those, that led up to the termination of the

22   case.

23       MR. VLAHAKIS:  I assume you're objecting to

24   any --

27

1    MR. WARNER:  I'm objecting to the answers of

2    what exactly those conversations were, yes.  But if

3    you're looking for the elements of adequacy here,

4    does she communicate with her attorney, she's

5    answered that one already.

6    MR. VLAHAKIS:  I'm trying to understand though.

7    You're saying that her knowledge of why the lawsuit

8    may have been dismissed, it sounds like it's

9    completely bound up in what you said to her and

10    it's privileged.  But I'm asking her whether she

11    saw any document that may have led to the dismissal

12    of the lawsuit, and that's independent of

13    attorney-client privilege.

14    MR. WARNER:  Well, you can answer that

15    question.  Have you seen a document about the

16    dismissal?

17    THE WITNESS:  I've seen a document the lawyer

18    has presented me with.

19    BY MR. VLAHAKIS:

20    Q.   Did you sign any particular document your

21    lawyer presented to you?

22    A.   The lawyer has presented me with various

23    documents and I do have to sign it.

24    Q.   Do you recall what you may have signed?

28

1     MR. WARNER:  I object to that.  Don't answer

2   that.

3     MR. VLAHAKIS:  What's the basis for that?

4     MR. WARNER:  Counselor, again you're walking

5   this line of things that you have communicated with

6   me within the other case.  And, again, I don't have

7   an issue of having Judge Holderman rule on it, but

8   I don't think that given what was done in Siegel

9   and the conditions of what was done in Siegel, I

10   don't think those are proper questions.  I think

11   you're really walking a tight rope here on your

12   line of questioning.  I don't have a problem of

13   letting Judge Holderman decide, and we can call him

14   and if he decides that she needs to answer, then

15   she can answer them.  We'll make ourselves

16   available here today.  We can call him at the end

17   of the deposition to find out whether or not she

18   needs to answer those questions or not, but at this

19   point in time, no.

20     MR. VLAHAKIS:  Are you saying that any

21   attorney or some other law firm representing MRS in

22   this case, they would not be able to ask her the

23   basis of why the case was dismissed?

24     MR. WARNER:  Well, look, you're asking me about

29

1    two different issues here.  One is a hypothetical.

2    I don't want to answer a hypothetical.  I'm only

3    going to answer what I've answered here is that you

4    know what the communications were, you know why

5    there was a dismissal in Siegel, and the only thing

6    that she's here to testify about is adequacy.

7    You've asked her about whether she's communicated.

8    Yes, she's communicated with her client about that.

9    If you want to go into Siegel's issues, perhaps

10   that is something that you might want to bring in

11   front of Judge Kacoras or Judge Holderman.  If you

12   want her to answer anything about Siegel more than

13   did you communicate with your client, did you see

14   the dismissal documents, did you sign any

15   documents, and that's --

16        MR. VLAHAKIS:  I've asked her if she signed

17   anything, and you're refusing to let her identify

18   what she signed.

19        MR. WARNER:  Right.  I'm refusing, exactly, to

20   identify what she signed.

21        MR. VLAHAKIS:  What I'm asking though for

22   adequacy purposes if I can go into whether or not

23   she has settled other cases out, and any attorney

24   could ask that question.  I'm respecting the fact

30

1    that I may know something about the Siegel case,

2    but any attorney should be able to ask that

3    question as to adequacy of a class rep; have you

4    ever settled out another case.  That's specifically

5    what we're discussing, not the settlement amount,

6    not specific terms or anything like that or the

7    scope of the release, but we're asking what anybody

8    could ask.  And, in fact, we did have a discussion,

9    I believe it was Magistrate Judge Gilbert in the

10   Martin case, where we were allowed to go into this

11   type of questioning on the cases that Mr. Martin

12   had.

13        MR. WARNER:  I'm not familiar with that, but,

14   anyway, Miss Tang is not the Plaintiff, DG is the

15   Plaintiff, she's Next Friend in those cases.

16        MR. VLAHAKIS:  She would have authorized

17   something potentially.

18        MR. WARNER:  Well, she authorized the

19   dismissal, she's already testified to that.

20        MR. VLAHAKIS:  Let's table this for now, and if

21   we at a later date need to bring it up, we can

22   discuss with the judge what we've discussed on the

23   record here, what objections there were, and just

24   leave it at that apparently.

31

1    MR. WARNER:  I'm open to take it up with the

2    judge at any time.  For convenience sake so we

3    don't have to schedule a deposition, if the judge

4    rules in your favor, I mean we'll make ourselves

5    available for that.

6    MR. VLAHAKIS:  What are you proposing, instead

7    of at the end of the dep, do it now, talk to the

8    judge or --

9    MR. WARNER:  Yes, you can do that now.

10    MR. VLAHAKIS:  How does your schedule work?  I

11    don't want to have to drag you back for a

12    deposition or we can do it telephonically if he

13    says -- if I'm entitled to go into that, I have no

14    problem reconvening this.

15    MR. WARNER:  Or we can answer the questions by

16    written under oath as an interrogatory, I don't

17    have a problem with that either.

18    MR. VLAHAKIS:  Let's just take that.

19    Miss Tang, to save you the time of Curtis and I

20    debating this, we'll sort of table this for another

21    time, and we'll move on to some other questions,

22    fair enough?

23    THE WITNESS:  Fair enough.

24

32

1    STATE OF ILLINOIS   )

2                         )   SS:

3    COUNTY OF W I L L   )

4          I, CHRISTINE M. PINA, do hereby certify

5    that heretofore, to-wit, on October 20, 2011,

6    personally appeared before me, at 222 North LaSalle

7    Street, Suite 300, Chicago, Illinois, LOIDY TANG,

8    in a cause now pending and undetermined in the

9    United State District Court, Northern District of

10   Illinois, wherein LOIDY TANG is the Plaintiff, and

11   MEDICAL RECOVERY SPECIALISTS are the Defendants.

12         I further certify that the said LOIDY TANG

13   was first duly sworn to testify the truth, the

14   whole truth and nothing but the truth in the cause

15   aforesaid; that the testimony then given by said

16   witness was reported stenographically by me in the

17   presence of the said witness, and afterwards

18   reduced to typewriting by Computer-Aided

19   Transcription, and the foregoing is a true and

20   correct transcript of the testimony so given by

21   said witness as aforesaid.

22         I further certify that the signature to

23   the foregoing deposition was reserved by counsel

24   for the respective parties.

                                                        82

1          I further certify that the taking of this

2     deposition was pursuant to notice and that there

3     were present at the deposition the attorneys

4     hereinbefore mentioned.

5          I further certify that I am not counsel

6     for nor in any way related to the parties to this

7     suit, nor am I in any way interested in the outcome

8     thereof.

9

10          IN TESTIMONY WHEREOF:  I have hereunto set

11     my hand and affix my notary seal this 4th day

12     of November, 2011.

13

14

15          _Christine M. Dina_

16          NOTARY PUBLIC, WILL COUNTY, ILLINOIS

17          LICENSE NO. 084-003785

18

19

20

21

22

23

24

                                              83